Moses Rash, the defendant, was indicted for an assault and battery committed on Samuel Derry, a negro man. There was no formal opening of the case to the jury. The jury having been sworn, Mr. Draper, the Deputy Attorney General, stated to them, that they were empanneled to try the defendant for an assault and battery, as charged in the indictment, and without further remark proceeded to call his witnesses. "The first witness called was a negro man, named Berry. He took his place at the witness stand ready to testify, when the counsel for the defendant objected to his competency, on *Page 272 
the ground of the Act of Assembly of February 3, 1799, the eighth section of which was re-enacted in 1852 and is to be found in section 4 of chapter 107 of the revised code:; which section declares, that in criminal prosecutions, a free negro or free mulatto, if otherwise competent, may testify, if it shall appear to the Court that no competent white witness was present at the time the facts charged is alleged to have been committed, or that a white witness being so present, has since died, or is absent from the State, and can not be produced."
This is the first time the constitutionality of the civil rights bill, or any provision of it, has been formally presented and argued, and submitted for the decision of this Court. At the first term of the court in the county of Sussex, I think, which was held after the passage of the act of Congress, and also, at the terms which immediately followed in Kent and New Castle, upon trials of negroes for felonies, I took occasion to announce to the gentlemen of the bar that whenever the question of the constitutionality of the civil rights bill as touching proceedings in the Courts of this State should be made and argued we should hold ourselves bound to decide it. From that day to this, no one in either county has shown sufficient interest in the question to present and argue it, and so the question has remained undecided up to this time.
The precise question raised by the objection of Mr. Comegys on behalf of the defendant, namely, the right of a negro to give evidence in the Courts of this State, against a white person by force of the civil rights bill, and in contravention of our own act of assembly, has never hitherto been presented for our consideration, has never hitherto arisen here. It has, however, frequently arisen in other States, and it is certainly a matter of regret that the question has not been passed upon by the Supreme Court of the United States.
It may possibly turn out that the testimony of the negro man called as a witness, may be properly admissible on another ground. However, the question now before us for decision, is the competency of the negro to give evidence in this Court by force of the civil rights bill and I am not disposed to evade it. It may as well be settled *Page 274 
now, so far as the Court is concerned, as at any other time, since, otherwise, it must necessarily still continue to confront us.
The exclusion of negroes as witnesses is believed to date back to the time when slavery was first introduced into this country. Indeed we know of no period in our history when they were held competent to testify against a white person in any case, civil or criminal, except under special conditions as provided for by the acts of 1787 and 1799. The common law doctrine that slaves were competent witnesses, has never been recognized in this State; on the contrary, the rule of exclusion has always prevailed as settled law. As slavery was exclusively confined to the black or colored race, color became the badge or sign of servitude, and the rule of exclusion was extended and applied to all who bore that badge whether slave or free. And so the law continued to be until modified by the acts of Assembly to which I have just referred.
I think it is a mistake to assign as the ground of their incompetency, the want of sufficient mental capacity or intelligence to speak the truth. It seems to me rather, that the theory or ground upon which they were excluded was an assumed defect of moral character on their part, superinduced by their ignorant, degraded and servile condition. They were slaves. They were subject, body and mind, to the absolute control of their masters, and were bound to obey their master's will in all things. In course of time some of them were set free, and were recognized by the law as free. But the rule of unqualified exclusion remained in full force until the legislature, by the acts of 1787 and 1799, recognized free negroes as possessing certain civil rights, to wit: the right to hold properly, and to obtain redress in law and equity, for any injury to person or property, and allowed them, under certain circumstances, to give evidence against white persons. Now I do not intend that my opinions, in regard to the law which excludes negro testimony, shall be misunderstood. I hold the law to be wrong and indefensible. *Page 275 
The condition of things has changed. The reason for the rule of exclusion has ceased to exist. The negroes are now all free, and there no longer remains any good reason why they should not be allowed to testify. I speak for myself on this point. I think the continuance of the law inexpedient and unwise, and that it should be repealed, and that negroes should be made competent to testify in all cases in which white persons, under like circumstances, are held to be competent. Their credibility would still be left to a white jury. Moreover, their evidence is becoming every day more and more important to the white race, to say nothing of its importance to the black race.
And now, as to the civil rights bill, or rather, as to the power of Congress under the constitution to prescribe a rule mandatory in its nature requiring a State Court to admit a negro as a witness to give evidence before it. Has Congress power to do this? Has Congress power to prescribe rules of evidence, and regulate the mode of proceeding in a State Court? Or, in other words, has Congress power to compel a State Court to admit a certain class of persons to testify in contravention of a State law?
Prior to the adoption of the constitutional amendment, it was always and everywhere conceded that Congress had no power to regulate the remedy in State Courts, but that this power belonged exclusively to the States, respectively. Now, the admission or rejection of evidence, the competency or incompetency of a witness, touches the remedy; and the remedy, as we have said, has hitherto always been considered as being subject to state regulation and control. Even in regard to contracts, the States may modify the remedy, as they please, provided they leave some remedy.
Again, it seems to have been pretty well settled, that the entire judicial power of the United States must be vested in federal courts; for the constitution expressly requires that the judicial power shall be vested in Courts *Page 276 
ordained and established by the United States. The constitution is imperative on this point. It would seem, therefore, quite clear that Congress cannot confer upon, or vest in a State Court any judicial power or authority, or impose upon it the duty of performing anyjudicial act or function prescribed by a federal law. A State Court derives its jurisdiction and powers from the constitution and laws of the State; and it is not and cannot be made, the instrument of Congress for the enforcement of federal law. If, therefore, Congress cannot confer any judicial power or authority on a State Court, it would seem to follow, that it cannot compel a State Court to admit a witness to give evidence. He cannot "give evidence" before he is sworn, and he cannot be sworn without the order of the Court, the swearing of him is the act of the Court, his admission or rejection is the act of the Court, and these several matters involve the exercise of discretion and judgment, and are of a judicial character; they are not merely ministerial.
The civil rights bill contains many provisions, some of them of a very grave character. One provision of a law may be unconstitutional, and all the rest constitutional. Or a law may be constitutional as applied to the federal Courts, and unconstitutional as applied to State Courts. All that concerns us for the present, however, in regard to the civil rights bill, is the clause in the first section which declares, in effect, that negroes shall have a "right to give evidence" in State Courts. This "right" as it is called, Congress undertakes by the second section, to compel us to accord to them in this Court in fear of certain pains and penalties denounced against us in case we decline to obey their mandate. Now, it seems to me that this is an alarming stretch of federal power, an aggressive and an unconstitutional invasion of the judicial authority of: the State; which, if tolerated, must ultimately prove destructive of the independent administration of public justice. The law of the State excludes the negro from testifying; the civil rights bill says he shall *Page 277 
have a right to give evidence; and thus there is brought about a direct conflict between the two laws. They both cannot be obeyed. And hence, the judge, in the exercise of his best judgment, arrives conscientiously at the conclusion that Congress has assumed to itself the exercise of power not warranted by the constitution; and that, therefore, the act of Congress, so far as it attempts directly or indirectly, to regulate the proceedings in the State Courts, is invalid. Was it ever before supposed by any lawyer that a Judge, who, in the discharge of his judicial functions, and in obedience to the express prohibition of a statute of his own State, should refuse to allow a certain class of persons to testify in a case pending before him, could be held criminally responsible for such refusal. Congress is not omnipotent. On the contrary, its powers are limited, and its legislation must be confined within the fair scope of the powers granted by the constitution. From the time of Edward the Third until recently it has always been considered settled law that no Judge could be held answerable, civilly or criminally, for an error of judgment in doing or refusing to do any official act in the exercise of judicial power. For an abuse of power he may be impeached, nothing else. Certain it is, that prior to the adoption of the constitutional amendment no one dreamed that Congress possessed any such power.
But it is said that the second section of the amendment confers the power upon Congress to compel State Courts to admit negro testimony in all cases in which, under like circumstances, white testimony is admissable. Well let us see whether this is a fair and reasonable construction of the amendment. Now, the second section confers no power on Congress which Congress would not have had without it. The first section makes the negro race free. It does nothing more. They are free by the Supreme Law, the constitution. The testimony of no witness is necesessary to establish that fact. Under no circumstances can they be reduced to the old condition of slavery, so long as the constitution stands. And hence this freedom is assured *Page 278 
to them, unless they forfeit it by the commission of crime. So that there can be no legal involuntary servitude, but such as results from the judgment of a Court of competent jurisdiction, and in regard to that judgment and its results, the record alone can speak. But this kind of servitude is recognized as legal and proper, and the testimony of witnesses cannot discharge the party when once duly convicted.
But how are we to arrive at the true interpretation of a constitutional provision? In the first place, we must consider the end proposed to be accomplished by it; and in considering this, we must give to the words used, just such operation and force, and no more, as is consistent with their legitimate meaning, as applied to the subject matter about which they treat. Now it is perfectly manifest that the end proposed, was the abolition and extirpation of slavery, within the States and Territories of the United States. And it seems to me, to be equally clear, that the second section was intended to confer upon Congress power, by appropriate legislation, to vest in the federal Courts, just such jurisdiction and authority as might be found necessary or proper for carrying into effect the end proposed by the first section of the amendment. For it must be borne in mind that there is nothing in the amendment, that can be construed to refer to Stats Courts. And we must also remember that federal laws must be enforced by and through the instrumentality of the federal judiciary.
Whatever legislation, therefore, may be necessary or proper, to extinguish slavery, or involuntary servitude, or to prevent restraint of, or interference with, personal liberty is clearly within the power of Congress. And Congress may, very properly, regulate the mode of proceeding, the competency of witnesses, the nature and character of evidence to be admitted, and all other matters touching the trial of cases, or the administration of justice in the federal Courts, or before judicial officers of the United States. And for any illegal interference with *Page 279 
or restraint of personal liberty, Congress has power to provide an appropriate and speedy remedy, to be administered by the federal judiciary.
Every one knows, who is at all familiar with the subject, that the appellate jurisdiction of the United States, as at present exercised, is very comprehensive indeed. It extends to all cases arising under the constitution and the laws of the United States, or where the validity, or construction of the constitution, or a law of the United States, is drawn in question. And a case may be said to have arisen under the constitution, or a law of the United States, whenever its correct decision depends upon the true construction of either. And as Congress is imperatively required to vest the whole judicial power of the United States in a superior Court and such inferior Courts as it shall ordain and establish, it has power to provide for the exercise of the appellate jurisdiction in such form as may be deemed proper, the manner or mode of removal being mere form and not substance. It may be by writ of error, appeal, or removal on petition, or in such other form, as Congress may see fit to prescribe. But whether, under the appellate power, Congress, has made any provision, or can make any provision, for the removal of a case like this, are questions which we are not called upon to decide.
The construction, and the laws of the United States, which shall be made in pursuance thereof, are the supreme law of the land, and as such, are binding on all the Judges of every State, any thing in the constitution or laws of any State, to the contrary notwithstanding. But the law to be binding, must be made in pursuance of the constitution; that is to say, it must be a constitutional law. An unconstitutional law, is a mere nullity.
The question presented here, is a naked question of power. The statute law of this State excludes negroes from being witnesses, except under certain circumstances. The civil rights bill of Congress, in effect, declares that they shall have a right to give evidence, in all cases in *Page 280 
which a white person is competent to testify; and it is contended that the act of Congress operates as a repeal of the statute law of this State which excludes them, and is binding on this Court. I do not think so. I think Congress had exceeded its power. I am therefore of opinion, that in so far as the civil rights bill assumes to compel, regulate, or control the admission of evidence in the Courts of this State, it is inoperative, unconstitutional and void.
The fact that the negro man called as a witness, was the person on whom the assault and battery had been committed, having come to the knowledge of the Court, the Chief Justice, remarked that his testimony was admissible under the rulings of the Court, on the ground of humanity and necessity, although there was a white witness present, and he referred to the case of the State against Whitaker. Mr. Comegys said he was not aware the rulings had gone to that extent; that if he had been, he should not have raised the question. The Chief Justice replied that the admissibility of negro testimony, was raised in the case of the State against Whitaker, for kidnapping, tried in Kent County in the year 1840, and also, in two other cases, one against Griffin, for kidnapping, and the other against Cooper, for an assault and battery. He stated that in those cases, competent white witnesses were present; that although in the cases of Whitaker and Griffin, the white persons present were participants in the crime, yet they were competent witnesses, and that in Whitaker's case an accomplice, named David Walton, was actually examined for the State; and yet the kidnapped negro boy, William Clarkson, was held to be a competent witness in the case; and that ever since those eases, it had been the practice of the Court, to allow the negro on whom the offense had been committed to testify.